# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | Case No. 15-00477-TLM |
| | ) | |
| TIMOTHY RESLER and | ) | |
| KIMBERLY RESLER, | ) | |
| | ) | Chapter 7 |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| JANINE REYNARD, trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 15-06052-TLM |
| | ) | |
| BANK OF AMERICA, N.A. | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| PETERSON, JAPAN, LLC, | ) | |
| d/b/a/ PETERSON AUTOPLEX, | ) | |
| | ) | |
| Intervenor. | ) | |
| _____ | ) | |

## MEMORANDUM OF DECISION
_____

In the chapter 7 case filed by Timothy Resler ("Resler") and Kimberly

Resler (collectively "Debtors"), the trustee, Janine P. Reynard ("Trustee"),

commenced an adversary proceeding against Bank of America ("BofA") to avoid

MEMORANDUM OF DECISION - 1

under § 547 a security interest held by BofA.[1]  Peterson, Japan, LLC ("Peterson")

filed a motion to intervene, which this Court granted.[2]  Trial was held on May 25,

2016, and the matter was taken under advisement.  This Decision constitutes the

Court's findings of fact and conclusions of law.  Rule 7052.

**FACTS**[3]

        In December 2014, Resler spoke with a sales representative of Peterson, a

Boise, Idaho automobile dealer, about trading in a 2010 Lexus he and his wife

owned toward the purchase of a 2015 Lexus LX570 ("Lexus").  Resler paid

$2,500 to Peterson on December 20 in order to have the new Lexus transported to

Boise.

        Resler signed several documents at Peterson's dealership on December 29,

2014.  Resler intended to purchase the Lexus as a co-buyer with Total

Maintenance Solutions, LLC ("TMS"), an Idaho LLC of which Resler was a 75%

---

        [1]  Unless otherwise indicated, statutory references are to the Bankruptcy Code, Title 11 U.S. Code §§ 101–1532.  Citations to "Rule" are to the Federal Rules of Bankruptcy Procedure.

        [2]  *See* Adv. Doc. No. 5 at 2–3.  Peterson asserted that the "dealer/financing agreement" between it and BofA required Peterson to submit title work to the appropriate governmental agency within 10 days of the contract date and that, whether the contract date was December 29, 2014 or January 15, 2015 (alternative date arguments are addressed *infra*), the submission by Peterson of title work was outside that required period.  BofA therefore demanded Peterson indemnify it as to all costs and expenses, and to defend Trustee's action.  *Id.*  Subsequently, Peterson actively defended the action on behalf of BofA, and BofA's counsel deferred without material exception to Peterson's counsel in all pleading, briefing, examination of witnesses at trial and oral argument.

        [3]  In addition to the witnesses examined and documents admitted at trial, the parties filed a joint stipulation of facts.  Adv. Doc. No. 51.

MEMORANDUM OF DECISION - 2

owner and the managing member.

Among these several documents was an LLC resolution to lease or finance

a vehicle. Ex. 303. It was signed by Resler as TMS' managing member.[4] He also

signed, as TMS' owner, an LLC authorization to borrow, Ex. 313, on a BofA

form. Resler also signed, personally and as manager for TMS, a Business Credit

Application. Ex. 302. While a "guarantor" box is checked in the section Resler

completed individually, Resler's testimony makes it clear that Resler and TMS

were co-applicants.

Peterson as "Creditor-Seller" entered into a Retail Installment Sale Contract

with TMS as "Buyer" and Resler as "Co-Buyer" for the purchase of the Lexus.

Ex. 304 ("Contract").[5] The Contract is an elongated single page, double-sided

document. The parties inserted relevant terms on the face page; preprinted terms

were on the reverse. After identifying the parties as above, the Contract recites:

> You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for
> cash or on credit. By signing this contract, you choose to buy the
> vehicle on credit under the agreements on the front and back of this
> contract. You agree to pay the Creditor – Seller (sometimes "we" or
> "us" in this contract) the Amount Financed and Finance Charge in U.S.
> funds according to the payment schedule below. We will figure your
> finance charge on a daily basis. The Truth-In-Lending Disclosures

---

[4]  The resolution indicated TMS could lease or finance a vehicle from "Dealer" but
"Dealer" was not specifically identified. It did specifically identify Dealer's intended assignees.
However, that list of assignees did not include BofA.

[5]  Trustee's Ex. 100 is a duplicate of the Contract, and was at times referenced in
examination of witnesses at trial. The Court simply refers to Ex. 304 in this Decision.

MEMORANDUM OF DECISION - 3

below are part of this contract.

*Id.*

A boxed section titled "FEDERAL TRUTH-IN-LENDING DISCLOSURES"

contains the financing details of the transaction.  This section includes an annual

percentage rate, a finance charge, an amount financed, total of payments, and total

sales price.  The first payment was due February 12, 2015.

Twice, the Contract states that the Buyer and the Co-Buyer grant a security

interest in the Lexus to the Creditor-Seller.  The first is in the FEDERAL TRUTH-IN-

LENDING DISCLOSURES box and states: "**Security Interest.** You are giving a

security interest in the vehicle being purchased."  The second is under a section in

the preprinted terms listed as "YOUR OTHER PROMISES TO US" and states:

> **c.    Security Interest.**
> You give us a security interest in:
> •      The vehicle and all parts or goods installed in it;
>        . . .
> This secures payment of all you owe on this contract.  It
> also secures your other agreements in this contract.  You
> will make sure the title shows our security interest (lien)
> in the vehicle.

*Id.*

On December 29, 2014, Resler signed his name on the Contract in six

separate places.  Resler's signatures on the "Buyer" lines did not show that he was

signing on behalf of TMS other than through the Contract's identification of the

MEMORANDUM OF DECISION - 4

parties at the outset, which defined TMS as the Buyer.

Addressing each area of signature specifically, Resler signed on two lines

labeled "Buyer Signs X_____" and "Co-Buyer Signs X_____" in a box that states:

> You agree to the terms of this contract.  You confirm that before you signed this contract, we gave it to you, and you were free to take it and review it.  You acknowledge that you have read both sides of this contract, including the arbitration clause on the reverse side, before signing below.  You confirm that you received a completely filled-in copy when you signed it.

*Id.*[6]  This box was also signed by Peterson.

Immediately above the signatures and language already quoted is the

following statement:

> HOW THIS CONTRACT CAN BE CHANGED.  This contract contains the entire agreement between you and us relating to this contract.  Any change to this contract must be in writing and we must sign it.  No oral changes are binding.

*Id.*  Resler signed both the Buyer and Co-Buyer lines following this statement.

Finally, Resler signed twice on a single line labeled "Buyer signs X_____"

in a box acknowledging the acceptance of an optional "gap contract."

There were other documents signed on December 29 as well.  One was a

Certificate of Origin for the Lexus, Ex. 300, which on its reverse side notes the

---

[6]  Immediately under the signatures of Buyer and Co-Buyer in this box is a place for signature by "other owner" and  the following statement: "Co-Buyers and Other owners—A co-buyer is a person who is responsible for paying the entire debt.  An other owner is a person whose name is on the title to the vehicle but does not have to pay the debt.  The other owner agrees to the security interest in the vehicle given to us in this contract."

MEMORANDUM OF DECISION - 5

transfer of the Lexus to Peterson, and then from Peterson to "Total Maintenance

Solutions LLC or Resler, Timothy Robert" with the signature on behalf of

Peterson being attested to on December 29. That reverse side also notes BofA in a

"lienholder" box.

There was also a "Vehicle Buyers Order," Ex. 314 ("VBO"), for the Lexus

that was printed out and shows TMS and Resler under "purchaser's name." It

commences: "Please enter my order" for the Lexus. It is signed on the second

page by Resler as the "purchaser." It is dated December 29, and indicates the

Lexus would be delivered on or about December 29. It is not executed by

Peterson at all. There is a separate, discrete box on the first page of the VBO

which states:

> You and the Dealer have agreed that the motor vehicle will be
> delivered to you prior to the purchase price being paid in full. If
> financing cannot be arranged on the terms and within the time period
> agreed upon in the Motor Vehicle Purchase Contract, the contract is
> null and void.

*Id.* This provision requires the Purchaser's signature; it is not signed.

Resler received possession of the Lexus and drove it off Peterson's lot on

December 29, 2014.

The Contract states "Seller assigns its interest in this contract to BANK OF

AMERICA (Assignee) under the terms of Seller's Agreement(s) with Assignee."

Peterson on December 29 sent a "financing package" to BofA which, upon

MEMORANDUM OF DECISION - 6

BofA's acceptance, would require Peterson to assign its rights in the Contract (*i.e.*, the rights of the Creditor-Seller) to BofA.  On December 29, BofA replied through a computer program (RouteOne) used by it and Peterson.  Ex. 201.  In reference to the financing package submitted for the purchase of the Lexus by TMS and Resler, BofA states:  "Decision: Approved by B of A on 12/29/14 – 02:44 PM."  It also states "This decision expires on 28-JAN-15."  *Id.*  The parties' stipulation characterizes this as a "conditional acceptance."

At some point, BofA recognized that it had issues with the manner in which Resler signed the Contract on behalf of TMS.  On January 15, BofA issued another decision through the RouteOne system.  Ex. 307.  It indicates "Decision: Approved by B of A on 01/15/15 – 01:09 PM" and states "This decision expires on 28-JAN-15."  In the "comments" section of this transmittal to Peterson, BofA states in pertinent part: "returned[,] missing business name and customers title on buyers portion of contract[,] please correct and return[.]"  *Id.*

After Peterson contacted Resler, he returned to the dealership and added the hand-written interlineation "Total Maintenance Solutions LLC" above his signature on each of the three "Buyer" signature lines, and added "owner" after his signature on two of those lines and "manager" after his signature on the other.  Ex. 305.

BofA subsequently transmitted to Peterson a "Contract Purchased Fax

MEMORANDUM OF DECISION - 7

Transmittal," on January 29. Ex. 309. It stated that "The contract listed below has been purchased by Bank of America effective 01/30/2015," and refers to the contract by number and shows the "Applicant" as Resler. Next to this information in the fax transmittal, someone made a handwritten insertion of TMS' name. There are a number of other hand-written notations on the document. Who made them, and when, was not made clear. Peterson's finance manager, Anthony Lamana, did testify that one of the notations reflected, to him, that the funds from BofA to purchase the assigned contract were received on February 2, 2015.

After this January 29 fax but before the funds were received, Peterson filed on January 30 a "Report Of Sale And Application for Certificate of Title." Ex. 310; *see also* Ex. 308 (list of title applications, including the Lexus at issue here, dated as received by the DMV on January 30, 2015).[7] The application, Ex. 310, showed TMS and Resler as "Owner #1" and "Owner #2." It was executed by Resler (twice) in the "applicants" portion, and also executed by Peterson. It reflected BofA as "primary lienholder." Title was subsequently issued on February 17, 2015 showing TMS "or" Resler as owners and BofA as the lienholder, with that lien recorded as of February 9, 2015. Ex. 311.

Debtors filed their petition for chapter 7 relief on April 16, 2015.

---

[7] Exhibit 310 is file stamped "February 5, 2015." The parties have stipulated, however, that it was delivered on January 30. *See* Adv. Doc. No. 51 at 3. This is consistent with Exhibit 308.

MEMORANDUM OF DECISION - 8

**DISCUSSION AND DISPOSITION**

### A.      Summary

In brief, the Court reaches the following conclusions of law upon the

parties' stipulated facts as well as the evidence put before it at trial.

1.      A contract was formed between TMS and Resler as purchasers

("Buyer" and "Co-Buyer") and Peterson as "Creditor-Seller" on

December 29, 2014, and that agreement's terms are embodied in the

Contract, Ex. 304.

2.      The Contract is a fully integrated and merged agreement, and not

modified by other documents.  While other documents were used to

solicit financing and the anticipated assignment of Peterson's

contract rights as Creditor-Seller (including its interests and rights as

secured creditor), they do not vary or modify the Contract's terms.

3.      The contention that the Contract was conditional, and formed only

upon the successful assignment of the Creditor-Seller's contract

rights to BofA, is not supported by the evidence.

4.      Resler took possession of and had an interest in the Lexus on

December 29, 2014, the same day as he granted, by the Contract, a

security interest to Creditor-Seller (and any later assigns thereof).

5.      The security interest granted in the Lexus was perfected more than

MEMORANDUM OF DECISION - 9

30 days after Resler took possession of the Lexus and incurred the debt to Peterson.

Upon the facts and these conclusions, the Court further concludes:

6.      BofA received a preferential transfer avoidable under § 547(b).

7.      BofA's preferential transfer is not protected by the defense against avoidance found in § 547(c)(3)(B).[8]

### B.    Discussion

### 1.    The Lexus is property of the estate

Upon the filing of a bankruptcy petition, an estate is created "composed of 'all legal or equitable interests of the debtor in property as of the commencement of the case'" *In re Bill*, 529 B.R. 779, 782 (Bankr. D. Idaho 2015) (citing § 541(a)).  Determining what property interests are included in the bankruptcy estate is made by reference to state law.  *Id.* at 783.

The Idaho motor vehicle title laws state "no person acquiring a vehicle from the owner, whether the owner is a dealer or otherwise, shall acquire any right, title, claim or interest in or to the vehicle until he has issued to him a certificate of title to that vehicle[.]"  *Hillen v. Dennis Dillon Auto Park & Truck Ctr., Inc. (In re Byrd)*, 546 B.R. 434, 439 (Bankr. D. Idaho 2016) (citing Idaho

---

[8]  Trustee bears the burden of proving the elements of a § 547(b) preference are met and, once that is shown, BofA bears the burden of proving any § 547(c) affirmative defense.  *See* § 547(g); *Crawforth v. Treasure Valley Fed. Credit Union (In re Tuttle)*, 2003 WL 22221330, *2 (Bankr. D. Idaho Aug. 21, 2003).

MEMORANDUM OF DECISION - 10

Code § 49-503). The owner of a vehicle is the person who appears as such on the title certificate. *Id.* If a debtor is listed as the vehicle's owner on an Idaho certificate of title on the petition date, that vehicle becomes property of the bankruptcy estate. *Gugino v. Jones (In re Antonie)*, 2011 WL 5913725, *2 (Bankr. D. Idaho Nov. 28, 2011). The result is the same if a debtor is listed as an alternate owner on the certificate. *Id.* "As alternate owners, each party on an 'OR' motor vehicle title has the ability to unilaterally transfer complete ownership of the vehicle to another." *Id.* (citing Idaho Code § 49-502; *Latham Motors, Inc. v. Phillips*, 851 P.2d 985, 991–92 (Idaho Ct. App. 1992)).

Resler is listed as an alternate owner on the Certificate of Title. Ex. 311. The title was issued on February 17, 2015, two months before Resler filed for bankruptcy on April 16, 2015. The Lexus is property of Debtors' bankruptcy estate.

## 2. The Contract was formed December 29, 2014

The formation of a contract is a matter of state law and, in Idaho, "generally a question of fact for the trier of fact to resolve." *Inland Title Co. v. Comstock*, 779 P.2d 15, 16 (Idaho 1989). Contract formation requires that there be a meeting of the minds, evidenced by a "manifestation of mutual intent to contract. This manifestation takes the form of an offer and acceptance." *P.O. Ventures, Inc. v. Loucks Family Irrevocable Tr.*, 159 P.3d 870, 875 (Idaho 2007). There must be a

MEMORANDUM OF DECISION - 11

meeting of the minds on the essential terms of the agreement, and a contract must be "complete, definite, and certain in all its material terms, or contain provisions which are capable in themselves of being reduced to certainty." *Lawrence v. Hutchinson*, 204 P.3d 532, 538 (Idaho Ct. App. 2009).

The "interpretation and legal effect of an unambiguous contract are questions of law[.]" *Luzar v. Western Sur. Co.*, 692 P.2d 337, 341 (Idaho 1984) (citing *Clark v. St. Paul Prop. & Liab. Ins. Co.*, 639 P.2d 454 (Idaho 1981)); *see also Credit Suisse AG v. Teufel Nursery, Inc.*, 321 P.3d 739, 746 (Idaho 2014). A contract is ambiguous if it may be "reasonably subject to conflicting interpretations." *Bakker v. Thunder Spring-Wareham, LLC*, 108 P.3d 332, 337 (Idaho 2005). A court will give an unambiguous contract its plain meaning. *Id.* "The purpose of interpreting a contract is to determine the intent of the contracting parties at the time the contract was entered." *Id.*

The Contract, Ex. 304, satisfies all the requirements of a contract under Idaho law. The Contract was formed, and under it Peterson, as Creditor-Seller, sold the Lexus to TMS and to Resler, the Buyer and Co-Buyer respectively, on December 29, 2014. The absence of TMS' name and Resler's title in the signature spaces on that date did not render the Contract ambiguous.[9]

---

[9]  Peterson cites *J.R. Simplot Co. v. Bosen*, 167 P.3d 748 (Idaho 2006), for the assertion that "A potential ambiguity arises where a signature block fails to designate whether a person is signing individually or in a representative capacity." Adv. Doc. No. 50 at 5. In *J.R. Simplot Co.*,
(continued...)

### 3.    The Contract is fully integrated, merged and complete

"If a written contract is complete upon its face and unambiguous, no fraud or mistake being alleged, extrinsic evidence of prior or contemporaneous negotiations or conversations is not admissible to contradict, vary, alter, add to, or detract from the terms of the contract." *Howard v. Perry*, 106 P.3d 465, 467 (Idaho 2005). "A written contract that contains a merger clause is complete upon its face." *Id.* at 468. A merger clause proves that an agreement is integrated. *Id.* Where two parties enter into a binding, integrated agreement, any "prior written agreements as well as prior oral agreements" are rendered inoperative. Restatement (Second) of Contracts § 213, cmt. a (1981).

The Contract contains a merger/integration clause. *See* Ex. 304 ("This contract contains the entire agreement between you [Buyer and Co-Buyer] and us [Creditor-Seller] relating to this contract. Any change to this contract must be in

---

[9](...continued)
Bosen filled out a "Commercial Sales Agreement" inserting the name of his company, Hogs 'n' Kisses, LLC ("Hogs"), in a box titled "Customer Account Name." *Id.* at 752. At the bottom of the document, he signed his name in a signature space labeled "Applicant," without designating a representative capacity. *Id.* The document also stated "*Applicant* agrees to pay the total amount due on each invoice/*customer* statement in accordance with the payment terms thereon, unless otherwise agreed in writing," thus differentiating between "Applicant" and "Customer." *Id.* (emphasis added). At no point does the document define the "Applicant" as being the same entity as the "Customer." *Id.* The court held that the document could reasonably be read as Bosen signing in his individual capacity as the "Applicant" or in his representative capacity as an agent of Hogs, thus creating an ambiguity that must be decided by a trier of fact. *Id.* This case is distinguishable. In contrast to *J.R. Simplot Co.*, the Contract here is consistent in its use of the titles "Buyer" and "Co-Buyer" and explicitly identifies TMS as an LLC and the Buyer, and the individual Resler as "Co-Buyer." BofA's concern about potential issues in *enforcing* the Contract against TMS does not create or evidence an ambiguity.

MEMORANDUM OF DECISION - 13

writing and we [Creditor-Seller] must sign it.  No oral changes are binding.").  The

Contract is thus the only document that contains the terms of the agreement

between Peterson and Resler.  No prior or contemporaneous documentary

evidence may be used to contradict the plain terms of the Contract.[10]

Peterson attempts to make much of the "contingency clause" found in the

VBO, Ex. 314.[11]  But this clause expressly requires signature by the purchaser(s),

and it was not signed.  Even if it were signed, the Contract's merger/integration

clause eclipses the separate VBO terms.

### 4.    There was no mutual mistake

Peterson argues that Resler's signing the Buyer's lines without clarifying

that he was signing on behalf of TMS impacts the formation of the Contract on the

theory of "mutual mistake."

"A mutual mistake occurs when both parties, at the time of contracting,

share a misconception about a basic assumption or vital fact upon which they

based their bargain."  *Bailey v. Ewing*, 671 P.2d 1099, 1102 (Idaho Ct. App.

1983).  "The mistake must be common to both parties. . . ."  *O'Connor v. Harger*

*Constr., Inc.*, 188 P.3d 846, 851 (Idaho 2008).  "Rescission is the proper remedy

---

[10]    Parol evidence (oral testimony) is also unavailable to contradict, vary or supplement
the terms of the Contract.  *Valley Bank v. Christensen*, 808 P.2d 415, 417 (Idaho 1991).

[11]    The language Peterson points to states "If financing cannot be arranged on the terms
and within the time period agreed upon in the Motor Vehicle Purchase contract, the contract is
null and void."  *Id.*

MEMORANDUM OF DECISION - 14

where there is a mutual mistake of fact that is material or fundamental to the

contract." *Id.* "Mutual mistake permits a party to rescind or modify a contract as

long as the mistake is so substantial and fundamental as to defeat the object of that

party." *Id.* The finding of a mutual mistake is a finding of fact, of which the party

alleging the mistake bears the burden of proof. *Id.*

Peterson failed to carry that burden. There was a mistake of *form*, not

*substance*, due to the missing (and later inserted) identification on the signature

lines of TMS' name and Resler's capacity. All parties knew, and the Contract's

definition of Buyer and Co-Buyer confirm, an understanding of the identity of the

two purchasing parties. There was no "misconception about a basic assumption or

vital fact." Further, should the manner of the initial execution of the Buyer's lines

here constitute a "mutual mistake," something the Court does not find, the remedy

allowed Peterson is rescission. The Contract was not rescinded.

### 5.    The Contract was not "conditionally" effective

Peterson further argues that because BofA financing was referenced, and

the Contract indicated "Seller assigns its interest in this contract to Bank of

America," the Contract was effective only when the assignment was accepted by

BofA. However, the Contract, which is complete and unambiguous, contains no

terms making it conditional on the dealer's anticipated assignment being

MEMORANDUM OF DECISION - 15

accepted.[12]

The contract was not voided.  No new contract was written.  TMS *and*
Resler had agreed to the terms of the contract as Buyer and Co-Buyer.  Peterson
had agreed to the Contract as Creditor-Seller.  BofA, perhaps reasonably enough,
wanted to avoid future disputes over the effectiveness of TMS' obligation under
the Contract given the manner or lack of identification of the capacity of the
individual executing on behalf of the LLC.[13]  But BofA's conditional acceptance
of the assignment does not equate to a conditionally effective contract between
Peterson and Resler.

### 6.    Preference

Trustee seeks to avoid BofA's interest in the Lexus as a preference under
§ 547(b), which allows a trustee to:

> avoid any transfer of an interest of the debtor in property—
>      (1) to or for the benefit of a creditor;
>      (2) for or on account of an antecedent debt owed by the debtor
>      before such transfer was made;
>      (3) made while the debtor was insolvent
>      (4) made—

---

[12]  Both Resler and Peterson's finance manager, Lamana, testified that, if financing "fell
through," Resler would have to bring the Lexus back to the dealership and make other
arrangements.  As noted above, parol evidence is not admissible to vary the terms of a complete
and unambiguous agreement.  And recall also that Resler was obligated as Co-Buyer to make all
the payments under the Contract, and in fact he testified he did make the payments.  The Contract
was effective and enforceable against—and by—Resler after December 29.

[13]  No witness from BofA testified as to BofA's view or process on the manner or style of
document execution by entities.  An employee of BofA, Kristin Goodwin, did testify, but only
briefly and only in general terms about the bank's auto financing processes, and she admitted
having no knowledge about this specific transaction.

MEMORANDUM OF DECISION - 16

(A) on or within 90 days before the date of the filing of
the petition
. . .
(5) that enables such creditor to receive more than such creditor
would receive if—
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the
extent provided by the provisions of this title.

The element at issue in this case is that of an antecedent debt under

§ 547(b)(2).[14]

Section 547(e)(2)(A) states "for the purposes of this section . . . a transfer is

made . . . at the time such transfer takes effect between the transferor and the

transferee, if such transfer is perfected at, or within 30 days after, such time, [or] at

the time such transfer is perfected, if such transfer is perfected after such 30 days."

What constitutes a transfer and when that transfer occurs is a question of federal

law.  *Crawforth*, 2003 WL 22221330 at *3 (citing *Fitzgerald v. First Sec. Bank (In*

*re Walker)*, 77 F.3d 322, 323 (9th Cir. 1996)).  The granting of a security interest

is a transfer.  *See* § 101(54).  A transfer is perfected when "a creditor on a simple

contract cannot acquire a judicial lien that is superior to the interest of the

transferee."  Section 547(e)(1)(B).

BofA holds, by assignment, the interests of Peterson under the Contract,

and steps into Peterson's shoes in that regard.  The interest transferred to the

---

[14]  Several of the § 547(b) elements were not contested, and the parties' stipulation, Adv.
Doc. No. 51, established that § 547(b)(5) was satisfied without requiring testimony or evidence at
trial.

MEMORANDUM OF DECISION - 17

creditor is a security interest in the Lexus.  The security interest was created in the Lexus, and to the benefit of Peterson, by the terms of the Contract on December 29, 2014.  *See* Idaho Code § 28-9-203(b) (generally, security interest attaches to collateral and becomes enforceable when value has been given; debtor has rights in the collateral; and debtor has authenticated a security agreement that provides a description of the collateral).  Resler had an interest in the Lexus under the Contract, and took possession of the Lexus, that same day.[15]

The parties did not focus on the date of perfection.  Here, Peterson filed multiple title applications, including the application for the Lexus, on January 30, 2015.  Ex. 308; Adv. Doc. No. 51 at 3.  The actual application regarding the Lexus is date stamped February 5, 2015, Ex. 310, and the title report issued by the Idaho Transportation Department shows a February 9 "recorded" date for the lien.

Idaho Code § 49-510(2) states that "A lien is perfected as of the date of the filing of a properly completed application with the department or an agent of the department."  Thus, this Court in *Gugino v. Credit Acceptance Corp., (In re Conklin)*, 511 B.R. 688 (Bankr. D. Idaho 2014), held that perfection occurs upon the filing of a properly completed title application, not necessarily the date listed on the certificate of title.  Here, the Court need not determine which of these dates

---

[15]  *See Gugino v. Canyon Fin. of Boise, Inc. (In re Green)*, 410 B.R. 904, 907–10 (Bankr. D. Idaho 2009) (addressing circumstances where individual has an interest in a vehicle though no certificate of title is yet issued); *see also* Ex. 300 at 2 (certificate of origin for Lexus, endorsed by Peterson to TMS or Resler as of December 29, 2014).

MEMORANDUM OF DECISION - 18

is the actual date of perfection, as all of them—January 30, February 5, February 9—fall beyond 30 days from December 29, 2014.  Thus, under § 547(e)(2)(A), the transfer through the granting of the security interest in the Lexus is deemed to have occurred for preference purposes on the date of perfection.

This establishes that the transfer on or after January 30, 2015 was on account of an antecedent debt.  *Krommenhoek v. Pfankuch Food Servs., Inc. (In re Pfankuch)*, 393 B.R. 18, 25–26 (Bankr. D. Idaho 2008), explains that for a debt to be antecedent, it must have been incurred before the transfer, and a debt is incurred when the debtor first becomes legally bound to pay.  Resler became legally bound to pay the purchase price for the Lexus upon the execution of the Contract on December 29, 2014.  That Peterson assigned its rights under the Contract to BofA through an agreement separate from the Contract did not create a new debt.  Upon the purchase of the Contract on January 30, *see* Ex. 309, BofA simply gained and thereafter held the rights to collect and enforce the debt Resler and TMS had previously owed to Peterson.

Trustee has established the elements of § 547(b).  The transfer is avoidable absent an applicable defense.

Peterson has argued the applicability of § 547(c)(3)(B).  That section provides a defense to preference transfer avoidance if the transfer creates a security interest in property acquired by a debtor for new value if such security interest "is perfected on or before 30 days after the debtor receives possession of

MEMORANDUM OF DECISION - 19

such property."  This Court defines "possession" in the § 547(c)(3)(B) context to mean "*physical control or custody* of the collateral[.]"  *Hopkins v. Lang (In re Carpenter)*, 378 B.R. 274, 279 (Bankr. D. Idaho 2007) (citing *Crawforth*, 2003 WL 22221330 at *5–6).

Resler received possession of the Lexus on December 29, 2014, and the security interest was perfected, at the earliest, on or after January 30, 2015.  That is to say, the interest was perfected at least 32 days after Resler received possession of the Lexus.  The defense is unavailable.

**CONCLUSION**

Trustee has established that Resler's transfer of a security interest in the Lexus is avoidable as a preference under § 547(b), and BofA has not established a statutory defense to that avoidable transfer.  Trustee may submit a form of Judgment consistent with this Decision.

DATED: June 3, 2016

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 20